Filed 4/15/22  Westco Petroleum Distributors, Inc. v. MCW Fuels, LLC CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| WESTCO PETROLEUM DISTRIBUTORS, INC., <br><br>      Cross-complainant and Appellant, <br><br>      v. <br><br> MCW FUELS, LLC, et al., <br><br>      Cross-defendants and Respondents. | B303859 <br><br> Los Angeles County <br> Super. Ct. No. EC062294 |

APPEAL and PURPORTED APPEAL from an order of dismissal following entry of order granting summary adjudication of the Superior Court of Los Angeles County, Ralph C. Hofer, Judge.  Affirmed; purported appeal treated as petition for writ of mandate, petition denied.

Omrani Law and Sepehr Omrani; Robert M. Ungar for Cross-complainant and Appellant.

TQM Law Corporation, Alon Hacohen; Jeff Lewis Law and Jeffrey Lewis for Cross-defendants and Respondents MCW Fuels, Inc., MCW Fuels, LLC, and Aleksandr Blyumkin.

Reuben Raucher & Blum and Timothy D. Reuben for Cross-defendant and Respondent Stan Boyett & Son, Inc.

No appearance for Cross-defendant and Respondent Phillips 66 Company.

———————

Westco Petroleum Distributors, Inc. (Westco) appeals from an order dismissing cross-defendants MCW Fuels, LLC, formerly known as MCW Fuels, Inc.[1] (MCW), Aleksandr Blyumkin (MCW's principal), Stan Boyett & Son, Inc. (Boyett), and Phillips 66 Company (Phillips) from Westco's second amended cross-complaint.  The trial court dismissed those cross-defendants after it granted MCW's motion for summary judgment, or alternatively, summary adjudication, finding Westco's assignment to MCW of five fuel distribution contracts for the delivery of Phillips's fuel were valid.  The trial court simultaneously denied, and found moot, Westco's cross-motion for summary adjudication asserting the assignments were invalid.

Westco contends it presented admissible evidence demonstrating the five assignments were void for failure of delivery, failure of consideration, and/or cancellation.  It argues the orders must be reversed and either its motion for summary adjudication granted, or the matter remanded for a trial on the

[1]     MCW Fuels, Inc. was formerly known as McWhirter Distributing Co., Inc.

2

issue of the validity of the assignments. Finding no prejudicial error, we affirm the orders as to Blyumkin. Westco appealed from a nonappealable order as to MCW, Boyett, and Phillips. Treating that part of Westco's appeal as a petition for writ of mandate, we deny the petition.

## FACTS AND PROCEDURAL BACKGROUND

In 2012, MCW was a fuel distribution company. It bought fuel from refineries, including Phillips, and distributed it to local gas stations. Westco similarly bought and distributed fuel. Both MCW and Westco were resellers and distributors of fuel for Phillips under separate "Master Branded Reseller Fuel Distribution Agreement[s]" with Phillips (reseller or master reseller agreements). At the time, Sami Dabbas was MCW's COO. Antone Nino ran Westco. He was its CEO and president, a director, and majority shareholder.[2] Westco's then-legal-counsel Kamal A. Bilal also was one of its officers and directors and had a 24 percent shareholder interest in the company.[3]

1. *2012 Master Agreement*

In June 2012, MCW entered into a written "Master Agreement" with Westco and Nino for the purchase of 16 branded reseller fuel distribution agreements (fuel contracts)—through

---

[2] MCW alleged Nino claimed to be Westco's sole shareholder. Nino died in January 2014. MCW sued Nino's personal representative, and Westco named the administrator of his estate as a cross-defendant. Neither is a party to this appeal.

[3] Bilal is a defendant and cross-complainant in this action. He is not a party to this appeal.

3

their assignment to MCW—in two phases.[4]  (One fuel contract was removed from the deal for a total of 15.)  Phase one involved MCW's purchase of seven fuel contracts for $1 million.  MCW paid Westco for those fuel contracts in June 2012; they are not part of this dispute.  Phase two involved the sale of the remaining contracts.

On August 20, 2012, MCW and Westco signed a First Amendment to the Master Agreement, effective June 14, 2012.  The amendment separated phase two of the sale into two parts: (1) MCW's payment of $300,000 to Nino—for Westco's and Nino's benefit—by September 1, 2012, for the purchase of three fuel contracts with Nino-owned gas stations (phase 2.1); and (2) MCW's payment of $700,000 to Nino—again for both Westco's and Nino's benefit—by December 15, 2012, for the remaining six fuel contracts (phase 2.2).[5]  Westco does not dispute the sale and assignment of the phase 2.1 fuel contracts to MCW.

On November 30, 2012, MCW learned one of the gas stations that was part of the phase 2.2 closing had been " 'debranded,' " and a lawsuit had been filed against Westco.  MCW alleged it, Nino, and Westco mutually agreed to modify the amended 2012 Master Agreement so that Nino and Westco would not sell the assignments for the last six gas stations.  Westco contends MCW gave notice on November 30, 2012— through an email from its attorney John Tiedt to Bilal (acting as Westco's attorney)—that it was terminating the 2012 Master

---

[4]    The fuel contracts were with Southern California Phillips-branded gas stations for the delivery of Phillips fuel.  Nino owned, through a partnership, eight of those gas stations.

[5]    For ease of reference only, we adopt MCW's characterization of the different closings.

4

Agreement as to those assignments and that any purchase would be under a new agreement. The email states, "MCW will not buy the remaining 6 assignments **today** pursuant to the Master agreement as Westco could not deliver [the sixth site] by today and therefore, MCW deems its obligations to have been discharged. [¶] [Dabbas] will contact [Nino] to discuss buying assignments pursuant to a new agreement."

## 2.     *2013 Master Assignment Agreement and Assignments*

On May 21, 2013, Westco and MCW signed a Master Assignment Agreement (2013 Master Agreement), effective June 1, 2013, for the sale of the fuel contracts for the remaining five gas stations that had been subject to phase 2.2 of the closing.[6] The parties concurrently executed five assignment agreements, one for each station's fuel contract, also effective June 1, 2013.

The 2013 Master Agreement provided MCW would pay Westco a total purchase price of $750,000 for the five assigned fuel contracts. A first payment of $200,000 was to be used as a credit on existing debt owed to MCW by eight gas stations from earlier fuel deliveries. MCW was to make a "second payment" of $550,000 to Westco "upon" Phillips's approval of the agreement and all assignments. Under the purchase price provision, a subsection entitled "Voidable Agreement" provides,

> "MCW will have no obligation to pay
> Westco unless all Assignments have been
> signed by all parties. If [ ] Phillips fails or
> refuses to approve this Agreement and the

---

[6]     The parties agreed to exclude the debranded station. On appeal, Westco contests the validity of these five assignments only.

5

Assignments by July 3, 2013 ('Expiration Date') or [ ] Phillips sends a written rejection of this Agreement and/or the Assignments, then this Agreement and the Assignments are void and Westco must return the first payment of . . . $200,000[ ] to MCW within five . . . business days of the receipt of the written rejection by [ ] Phillips or the Expiration Date."

The closing provision immediately follows. It provides for the closing of the transaction to occur on July 3, 2013, "or on such other date as the parties mutually agree in writing." The provision continues,

"Time is of the essence and Westco agrees that it will promptly work to close this transaction by no later than July 3, 2013. If this Agreement is delayed beyond July 3, 2013 by Westco then MCW has the option to terminate this Agreement and require immediate return of the first payment."[7]

Both the 2012 and 2013 Master Agreements include the following integration/no-oral-modification clause: "This Agreement . . . is a complete statement of the terms and conditions concerning the subject matter of this Agreement and it may not be modified, amended, altered or supplemented, discharged or terminated, except by

---

[7]     The provision also gives MCW the ability to conduct due diligence and the "unilateral right to terminate" the agreement before the closing date if its due diligence were to reveal "any material misrepresentations or material inaccuracies."

6

an agreement in writing executed by each of the parties hereto." Each assignment agreement also contained a no-oral-modification clause.

In June 2013, a dispute allegedly arose between Bilal and Nino over, among other things, Bilal's entitlement to 24 percent of any sum paid to Westco, and whether his consent to the sale of the assignments was required. On appeal, Westco does not dispute Nino's authority to enter into the 2012 or 2013 Master Agreements and to assign the five fuel contracts to MCW on behalf of Westco.[8]

On June 21, 2013, after having received an email from Bilal stating he must consent to selling the fuel contracts, MCW's attorney Tiedt replied, "Since money never changed hands and Westco did not perform, there will be a cancellation of the contract, not a termination. I am drafting the cancellation right now." On June 25, 2013, MCW's COO Dabbas signed a "Cancellation of Master Assignment Agreement" that purported to cancel the 2013 Master Agreement and related assignments, effective June 24, 2013. The signature blocks for Westco and Nino are blank.

On August 14, 2013, MCW, Westco, and Nino entered an "Authorization Verification and Indemnity Agreement" (2013 Authorization Agreement), effective June 1, 2013.

---

[8]     In its own motion and in response to MCW's motion, Westco argued Nino did not have authority to enter into the transactions at issue on behalf of Westco. As Westco has abandoned the issue of lack of authority on appeal, we presume the trial court correctly ruled Nino had authority to enter into the disputed transactions on behalf of Westco, and, if he exceeded his authority, Westco's sole remedy was with Nino through a shareholder dispute.

7

That agreement's recitals refer to and incorporate the parties' earlier 2012 and 2013 Master Agreements.  As to the 2013 Master Agreement, the recitals state,

> "D.  A Second Master Assignment Agreement was entered into on June 1, 2013 for the assignment of five . . . [fuel contracts] for [f]ive . . . gas stations in Southern California.  A copy of the June 1, 2013 Second Master Assignment Agreement is incorporated herein as though fully set forth.
>
> "E.  The parties desire to negotiate further agreements and as a condition precedent to negotiations, the parties have now agreed to enter into an Authorization Verification and Indemnity Agreement."[9]

Before August 21, 2013, Westco bounced an electronic funds transfer to Phillips for more than $270,000.  Phillips placed Westco on a " 'credit hold' " and stopped supplying fuel to Westco for the five gas stations subject to the 2013 Master Agreement and assignments, which were the only stations Westco still serviced.  Phillips would not fill Westco's fuel orders as long as the credit hold remained.  By the end of August 2013, due to further missed payments, Westco owed Phillips about $1 million.  Phillips never lifted Westco's credit hold.

On August 21, 2013, after Phillips cut off Westco's fuel supply, Tiedt told Bilal in an email that MCW wanted "to take

---

[9]     Among other things, the 2013 Authorization Agreement included Westco's representation and warranty that Nino was authorized to enter into the 2012 Master Agreement and amendment, and the 2013 Master Agreement.

the sites on a temporary basis just to supply fuel so that the stations won't be shut down. [Phillips] is ok with that. This is a temporary fix and we agree to takeover [*sic*] the sites until you and [Nino] resolve your issues. It is again just a temporary situation." The next day several emails were sent among, forwarded, or copied to, Tiedt, Bilal, Nino, Dabbas, and William Thomas, the Phillips sales representative who handled Westco's and MCW's accounts. Addressing Bilal, Tiedt wrote,

> "MCW is not buying contracts from Westco. . . . MCW has simply offered to take over the 5 sites at issue on a <u>temporary basis</u> as a favor to Westco and [ ] Phillips. Nothing more. [¶] The dispute you have with your partner [Nino] is all the more reason not to consider any deal with Westco until the Westco shareholders resolve their differences. I have advised my clients not to make any offer to purchase contracts and as [Dabbas] told you, he has no interest in making any such offer at this time. You and [Nino] must work out whether you will honor your contracts with your customers or just let the stations shut down."

Thomas wrote that if there was not going to be a "temp transfer of Westco sites to MCW," then Westco would have to wire funds to Phillips "to get [the] fuel released to the 6 sites." Nino responded to Thomas that the transfer was temporary to help Westco's customers stay in business, and—as the president and majority stockholder of Westco—asked Thomas to complete the transaction.

After much back and forth, Tiedt, addressing both Bilal and Nino, wrote:

"[Nino] as chief executive officer of Westco, has asked MCW to step in and deliver fuel to maintain Westco's customer base. . . . [¶] Due to the fact that Westco has lost its credit with [Phillips], Westco cannot deliver fuel to its customers. Westco cannot perform its contractual obligations. [Nino], on behalf of Westco has given MCW [a]pproval to temporarily deliver fuel. MCW will be paid for selling and delivering fuel. . . . MCW will gladly turnover [*sic*] the fuel delivering responsibilities when instructed. Further, we are hopeful that both of you work out your differences. In the interim, MCW will do its best to handle the 5 sites in question."[10]

In August 2013, MCW and Westco asked Phillips to consent to the assignment to MCW of Westco's rights under its reseller agreement with Phillips to, among other things, sell Phillips's fuel to the five gas stations that were subject to the assignments. Phillips consented to the transfers. Nino on behalf of Westco, and Dabbas on behalf of MCW, signed "Ship to Transfer - Close" and "Ship to Transfer - Create" customer status update forms, respectively, removing the stations from Westco's reseller agreement with Phillips and adding them to MCW's reseller agreement with Phillips. The transfer forms had effective dates of August 12, 19, and 23, 2013.

---

[10] The trial court sustained MCW's objections to the exhibits of these email exchanges as inadmissible hearsay and lacking foundation and authentication.

10

The ship to transfer forms include an "Assumption of Responsibility Agreement/Unamortized Program Funds."  On the forms governing three of the five stations, that agreement states:

> "In consideration of [Phillips's] acceptance and administration of this transfer, MCW . . . (Receiving Reseller) agrees to assume the responsibility and obligation for payment(s) to [Phillips] of the unamortized amounts listed above, if any, previously the responsibility of Westco . . . (Current Reseller) effective on the date hereof . . . .  If during the amortization period(s) the Ship To(s) is debranded . . . , or Receiving Reseller ceases to be a [Phillips] Reseller, Receiving Reseller hereby agrees to repay [Phillips] the remaining unamortized amount(s) listed above.  Current Reseller shall be released from any further liability to [Phillips] for the payment of the aforesaid amount(s) upon Receiving Reseller's assumption of responsibility for such payment. [Phillips] will accept and administer this transfer when Receiving Reseller has executed a CSU (Ship to Transfer-Create) and Current Reseller has executed a corresponding CSU (Ship to Transfer-Close)."

The total unamortized amount listed on the forms for the three stations is $222,124.20.  (Similar language appears on the forms for the other two stations, but no amounts were listed as due.)

Effective August 23, 2013, MCW and Phillips executed an amendment (the 30th) to their master reseller agreement to add the five stations, transferring to MCW the right and obligation to deliver Phillips's fuel to them.

11

### 3. *Events following the transfer of the fuel contracts*

On September 23, 2013, Bilal sued Nino, Westco, and other entities (Los Angeles Superior Court Case No. BC522207), and filed a verified first amended complaint on January 13, 2014. In his original complaint, Bilal alleged that, in August 2013, Westco "transferred the remainder of its valuable contract rights to resell branded gasoline to [MCW]. Thereafter, [Westco] ceased all of its gasoline distribution business." Bilal made the same allegation in the verified first amended complaint, but based it on information and belief. He also alleged on information and belief that, in August 2013, Nino transferred Westco's remaining assets to MCW, "namely[,] valuable branded gasoline reseller rights," without authorization.[11]

On December 17, 2013, Nino's and Westco's newly-retained attorney Robert Scapa wrote to Phillips to inform it that, to raise funds to pay Westco's debt to Phillips, Westco planned to "market and sell" five gas stations covered under its reseller agreement with Phillips and that agreement. The listed stations were those subject to the assignments that had been added to MCW's reseller agreement. Nino died in late January 2014. Bilal became Westco's sole director and CEO.

On March 6, 2014, Bilal wrote to Phillips, in his capacity as Westco's CEO, stating,

---

[11] Bilal alleged the lawsuit was seeking "to redress" Nino's and others' illegal diversion of income, profits, and assets from Westco, and that diversion had divested Bilal of his share of the income and profits and denied Bilal his proportionate share of the value of Westco, whose assets were "seize[d]" in disregard of Bilal's rights as a shareholder and director.

12

"As you know, five . . . contracts were transferred from [Westco] to MCW in or about August 2013. Under the terms of a Master Purchase Agreement, MCW is obligated to pay [Westco] $700,000 for the transfer of the five . . . contracts. To date MCW has been unwilling to pay the agreed upon purchase price for the five . . . contracts. [¶] [Westco] is currently exploring its remedies, including a demand that MCW transfer back the five . . . contracts to [Westco]. Is the consent of Phillips . . . necessary for the transfer back of the five . . . contracts from MCW to [Westco]?"

On April 18, 2014, MCW sued Westco, Bilal, Nino's representative, and others. It filed its operative first amended complaint (FAC) on August 6, 2014. MCW alleged causes of action for fraud, negligent misrepresentation, breach of written contract, and others. It alleged Bilal interfered in MCW's transactions with Westco and Nino and revealed, for the first time in mid-June 2013, that Nino was not the sole owner of Westco, claiming a 24 percent share of any amounts paid to Westco.

At some point in December 2014, cross-defendant (and cross-complainant) Boyett acquired the June 2013 assignments for the five fuel contracts as part of its purchase of certain assets from MCW.

Westco filed a cross-complaint on February 13, 2015, and its operative second amended cross-complaint (SACC) on

August 16, 2016,[12] asserting several causes of action, including breach of contract, intentional interference with contract, and conversion, among others. Westco alleged the assignments of the five fuel contracts were unauthorized and without consideration, and that Westco remained the legal owner of the contracts. Boyett and Phillips each filed cross-complaints for indemnity— Boyett against Westco and MCW and Phillips against Westco and Bilal.

### 4. *Summary judgment proceedings*

In September 2017, the trial court stayed the matter pending the outcome of Bilal's appeal from a judgment of dismissal in case number BC522207.[13] The trial court excepted from the stay order the issue of "the validity or invalidity of the assignments" of the fuel contracts to MCW. It ordered the unstayed matter "proceed first to the adjudication of whether Westco . . . carries its burden to establish the invalidity of the assignments" of the fuel contracts to MCW. In March 2019, the court bifurcated the unstayed matter, and set the issue for trial on November 4, 2019, with motions for summary judgment/adjudication on the issue to be heard September 20, 2019.

Westco and MCW filed cross-motions for summary adjudication and summary judgment, or alternatively, summary

---

[12] Westco originally cross-complained against cross-defendants MCW, Blyumkin, Boyett, Dabbas, Nino's estate, Nasrin Nino, Phillips, David Sutton, and Tiedt and related entities. Westco settled with Sutton and the Tiedt parties before filing its SACC.

[13] That case was before a different judicial officer. The appellate court reversed the judgment.

14

adjudication, respectively. Relevant to this appeal, MCW argued Westco could not meet its burden to prove the assignments were invalid, Westco was estopped from denying the validity of the assignments, and Westco had admitted the validity of the assignments. Westco argued the assignments were "void ab initio and invalid" for lack of authority—which it does not raise on appeal, for failure of delivery and consideration, and due to cancellation by MCW. Westco thus contended the five fuel contracts were never assigned, and it remained their rightful owner.

On October 4, 2019, the trial court heard argument on the parties' cross-motions.[14] Westco (joining Bilal) argued the assignments were invalid for nondelivery because the conditions to their delivery—Phillips's approval by July 3, 2013, and MCW's $550,000 payment to Westco—never occurred, and the evidence showed the parties intended to cancel their agreement. Westco asserted it was "not seeking to invalidate anything." Rather, its position was that the assignments were void from the outset for nonperformance and cancellation.

The court rejected Westco's argument that there had been a cancellation. The court construed the parties' various agreements as part of one overall transaction, and noted the five assignments at issue were listed in the original 2012 Master Agreement. It thus construed the 2013 Master Agreement as implementing the 2012 Agreement, explaining "[t]here were negotiations going back and forth about how to implement this sale under the 2012 agreement." The court noted, "Everything

---

[14] The court questioned counsel at the originally-scheduled September 20, 2019 hearing and, on its own motion, continued the hearing to October 4.

15

was going fine until you [Bilal] inserted yourself and said, 'I've got to approve this deal,' because you wanted your cut out of the sale." The court continued,

> "So when you sent that letter [in June 2013], after having negotiated with these parties for a year and not telling them that 'Oh, I am a shareholder. I have to approve the deal too. There is a shareholder agreement that you don't know about,' that caused further negotiations to implement the 2012 deal. It didn't create a new deal because you came in and tried to disrupt the original deal and tried to undo a deal that was done in 2012. [¶] So it didn't create a new deal. It just created a couple of obstacles that had to be overcome to finalize the implementation of the transfer. . . . There was no cancellation. . . . And your conduct caused additional negotiations to take place. . . . [A]nd it all relates to you getting your $300,000 or whatever you think you were supposed to get out of that deal. That's Nino's fault, not MCW's fault."

The court also rejected Westco's argument that the parties had not performed, noting Phillips "did approve the transaction and the assignments, and the money was transferred." The court admonished Bilal, "Don't tell me the evidence says they didn't perform," after explaining,

> "There's evidence of a $1.3 million purchase [referring to the earlier, undisputed assignments], and then there's evidence of an assumption of debt, which comes out to $2 million. . . . They spent $2 million, and

16

you want to undo this deal . . . , and you don't
have the money to pay them back when you
. . . undo this deal. [¶] . . . [¶] They can't do
anything and reverse anything.  Westco . . .
is not in business anymore.  They're basically
a defunct company.  So there's nothing they can
do to perform under any of these contracts."

After hearing argument, the court adopted its tentative ruling—granting MCW's motion and denying Westco's motion and finding it moot—as its final ruling.  The court's written ruling granted MCW's motion on several independent and alternative grounds, including:  there was no cancellation as a matter of law because there was no evidence of a writing signed by both parties as required under the terms of the agreements; Westco's evidence of "any purported cancellation of the assignments" was barred by the parol evidence rule under the agreements' integration clauses; Westco admitted the validity of the assignments in correspondence with Phillips; the unambiguous language of the agreements demonstrated the parties' intent in executing the assignment agreements was "to assign the rights" under the fuel contracts from Westco to MCW; and Westco was estopped from denying the validity of the assignments as a matter of law as the agreements recited Nino's authority to enter into the transactions.

On October 3 and 7, 2019, the court entered orders sustaining and overruling the parties' evidentiary objections to evidence submitted in support of and in opposition to their cross-motions.[15]  On October 24, 2019, the court entered its order

_____

15    Westco does not challenge these evidentiary rulings on appeal.  It thus has forfeited any claim that we should consider

17

granting MCW's motion, denying Westco's motion and finding it moot, as well as ordering the assignments of the fuel contracts to MCW for the five gas stations "were valid." Finally, on December 10, 2019, the court ordered the dismissal of MCW, Blyumkin, Boyett, and Phillips from Westco's SACC with prejudice based on its order granting summary adjudication on the validity of the assignments. Westco appealed.

## DISCUSSION

Essentially, Westco contends the five assignments were (1) void because MCW cancelled the 2013 Master Agreement—thus, the assignments were never delivered; (2) void for failure of condition precedent—also a failure of delivery—when Phillips did not approve them by July 3, 2013; and (3) void for failure of consideration when MCW did not pay Westco $550,000, which Westco describes as a failed concurrent condition. It contends triable issues of fact exist as to the parties' intent to transfer title of the fuel contracts.

---

evidence to which MCW's or Boyett's evidentiary objections were sustained, or exclude evidence to which its objections were overruled. (*Fritelli, Inc. v. 3520 North Canon Drive, LP* (2011) 202 Cal.App.4th 35, 41 [appellant who "does not attack the [trial court's evidentiary] rulings on appeal . . . forfeit[s] any contentions of error regarding them"]; see also *Soto v. Union Pacific Railroad Co.* (2020) 45 Cal.App.5th 168, 182 [appellant who failed to challenge on appeal trial court's overruling of her hearsay objection to testimony admitted in support of defendant's motion for summary judgment forfeited that claim]; *Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015 (*Lopez*) [considering certain evidence offered in opposition to summary judgment "to have been properly excluded" where appellant did not challenge ruling sustaining objections to that evidence on appeal].)

18

**1.** ***Westco's appeal as to MCW, Boyett, and Phillips***

"An appealable judgment or order is a jurisdictional prerequisite to an appeal." (*Connell v. Superior Court* (1997) 59 Cal.App.4th 382, 392; Code Civ. Proc., § 904.1.) The trial court's order of dismissal following entry of its order granting MCW's motion for summary adjudication on Westco's second amended cross-complaint is an appealable order as to Blyumkin, but not as to MCW, Boyett, and Phillips. The order of dismissal resolved all issues in the matter between Westco and Blyumkin, who has no claims pending against Westco. (See, e.g., *Aixtron, Inc. v. Veeco Instruments Inc.* (2020) 52 Cal.App.5th 360, 387 [recognizing direct appeal may be taken from a judgment that is final as to a party].) But, at the time the order of dismissal was entered, MCW's FAC still was pending against Westco, as were Boyett's and Phillips's separate cross-complaints. The order of dismissal, therefore, was not a final appealable order as to them. (See *California Dental Assn. v. California Dental Hygienists' Assn.* (1990) 222 Cal.App.3d 49, 59 (*California Dental Assn.*) [no appealable final judgment "with respect to parties as to whom a cross-complaint remains pending even though the complaint has been fully adjudicated"].)

We asked the parties for supplemental briefing on the issue of whether we should dismiss Westco's appeal as to MCW, Boyett, and/or Phillips. In response, Westco asked us to hear the merits of the entirety of its appeal by treating its appeal as to those three cross-defendants as a petition for writ of mandate; MCW informed us it had filed a request to dismiss its pending FAC against Westco and Bilal (without prejudice), disposing of all issues between them, and asked us to hear the merits of Westco's appeal to avoid unnecessary delay and inefficient resolution of claims; and Boyett asked us to dismiss the appeal as to it. Phillips did not respond.

19

We have discretion to treat a purported appeal from a nonappealable order as a petition for writ of mandate. (*H.D. Arnaiz, Ltd. v. County of San Joaquin* (2002) 96 Cal.App.4th 1357, 1366.) The single issue raised by Westco's appeal— whether the trial court erred in finding the five assignments were valid—requires us to review the same record and perform the same legal analysis as to each respondent. As we must resolve the appeal as to Blyumkin now, the interests of judicial economy will be better served if we resolve the issues as to all respondents at this time. (*G.E. Hetrick & Associates, Inc. v. Summit Construction & Maintenance Co.* (1992) 11 Cal.App.4th 318, 325–326 (*G.E. Hetrick*) [treating appeal as to parties against whom a cross-complaint was still pending as a petition for writ of mandate rather than dismissing appeal as to all but one defendant]; *Olson v. Cory* (1983) 35 Cal.3d 390, 401.)

Moreover, Blyumkin is jointly represented with MCW, and Boyett joined in MCW's brief. Although Boyett asked us to dismiss Westco's appeal, Boyett did not originally contest our jurisdiction (*G.E. Hetrick, supra*, 11 Cal.App.4th at p. 326) and will not be prejudiced if we consider the merits as to all respondents now. Indeed, *not* to consider the merits of Westco's appeal as to all parties would relegate MCW—the party who moved for summary adjudication in the first place and filed the only respondent's brief (with Blyumkin)—to an amicus curiae. (*California Dental Assn., supra*, 222 Cal.App.3d at p. 60 [dismissing appeal as to plaintiffs with pending cross-complaint would result in "the very fragmentation and multiplicity of appeals that the final judgment rule seeks to avoid" and would "remit the principal plaintiff and defendant to roles as amicus bystanders while a controversy that is principally theirs resolves itself"].) Accordingly, we exercise our discretion to treat Westco's

20

defective appeal as to MCW, Boyett, and Phillips as a petition for a writ of mandate. (*Ibid.*)

## 2. *Summary adjudication and standard of review*

Summary adjudication is proper if the papers submitted show there is no triable issue as to any material fact and the moving party is entitled to prevail on a cause of action as a matter of law. (Code. Civ. Proc., § 437c, subds. (c), (f)(1)–(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A defendant (or cross-defendant) moving for summary adjudication has the initial burden to show the plaintiff (or cross-complainant) cannot establish one or more elements of the challenged cause of action or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (p)(2).) If the defendant (or cross-defendant) makes a sufficient showing, the burden then shifts to the plaintiff (or cross-complainant) to demonstrate a triable issue of material fact exists. (*Ibid.*) A triable issue of fact exists if the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion. (*Aguilar*, at p. 850.)

We review the grant of a motion for summary adjudication de novo, in the same manner as we would on an appeal from the grant of summary judgment. (*Schofield v. Superior Court* (2010) 190 Cal.App.4th 154, 156; see *Aguilar, supra*, 25 Cal.4th at p. 860.) "[W]e must independently examine the record to determine whether triable issues of material fact exist." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767.) In so doing, "we must view the evidence in a light favorable" to the nonmoving party, "resolving any evidentiary doubts or ambiguities" in that party's favor. (*Id.* at p. 768.) We consider "all the evidence set forth in the moving and opposition papers," except that to which objections were made and properly sustained. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317,

21

334; *Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432.) "We need not defer to the trial court and are not bound by the reasons in its summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Oakland Raiders v. National Football League* (2005) 131 Cal.App.4th 621, 630.)

Here, the trial court framed the limited issue subject to summary adjudication (the only issue excluded from its order staying the action): whether the assignments of the five fuel contracts to MCW were valid or invalid. MCW moved for summary judgment or, alternatively, summary adjudication on the ground Westco could not demonstrate the assignments were invalid/void. Accordingly, as the moving party, MCW had the initial burden to show Westco could not demonstrate the assignments' invalidity or present evidence of a triable issue of fact as to their invalidity. MCW met its initial burden by introducing evidence that Westco assigned the fuel contracts to MCW, primarily through: the signed 2012 Master Agreement and amendment, the signed 2013 Master Agreement and five concurrently-signed assignments, the signed 2013 Authorization Agreement, and the signed documents transferring the gas stations subject to the assigned fuel contracts from Westco's master reseller agreement with Phillips to MCW's master reseller agreement with Phillips. MCW also presented evidence of the consideration it gave Westco for the five assigned fuel contracts, as we discuss in detail below.[16]

---

[16] MCW submitted two declarations from Essop Mia, an accountant and partner at the professional accounting firm that acted as the independent third-party auditor for MCW's publicly-traded parent company. The firm's audit of the company's consolidated financial statements included an audit of MCW's accounts, records, and transactions for fiscal years 2012, 2013,

The burden then shifted to Westco to raise a triable issue of material fact from which the fact finder could conclude the assignments were void ab initio (in other words, never delivered). We conclude Westco failed to meet its burden.

**3.** ***The trial court properly found the 2013 Master Agreement and five assignments were not canceled***

In determining the assignments of the five fuel contracts from Westco to MCW were valid, the trial court found they had not been canceled as Westco contended because no writing signed by the parties existed, as required by the unambiguous terms of the contract. We agree.

a. *Contract interpretation and the parol evidence rule*

Generally, interpretation of a contract is a judicial function. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125 (*Wolf*).) In interpreting a contract, the court "give[s] effect to the mutual intention of the parties as it existed at the time of contracting." (Civ. Code, § 1636.) "Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms." (*Wolf*, at p. 1126; Civ. Code, § 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"]; *id*., § 1638 [the "language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"].) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret

_____

and 2014. Mia declared he "obtained, reviewed, and audited the supporting and backup documentation for the transaction between MCW and [Westco] at or about the time that [he] was conducting the audits, in 2012, 2013, and 2014."

23

the other."  (Civ. Code, § 1641.)  And, "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." (*Id.*, § 1642; *Versaci v Superior Court* (2005) 127 Cal.App.4th 805, 814 (*Versaci*) [section 1642 also applies " 'to agreements executed by the parties at different times if the later document is in fact a part of the same transaction' "].)

"The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract."  (*Wolf, supra*, 162 Cal.App.4th at p. 1126; Code Civ. Proc., § 1856, subd. (a).)  The parol evidence rule does not exclude extrinsic evidence introduced to interpret an ambiguous term, to establish illegality or fraud, or where it is relevant to the issue of an agreement's validity.  (Code Civ. Proc., § 1856, subds. (f), (g).)  Moreover, even if the terms of a contract appear clear and unambiguous, extrinsic evidence is admissible if relevant to prove the language is "reasonably susceptible" to another meaning.  (*Pacific Gas & Elec. Co. v. G. W. Thomas Drayage & R. Co.* (1968) 69 Cal.2d 33, 37; *Los Angeles City Employees Union v. City of El Monte* (1985) 177 Cal.App.3d 615, 622–623 [court may resort to extrinsic evidence to resolve a latent ambiguity].)

> b.    *The trial court did not prejudicially err when it excluded Westco's extrinsic evidence offered to demonstrate MCW canceled the 2013 Master Agreement*

Westco contends the assignments were void because MCW canceled the 2013 Master Agreement on June 25, 2013, and the trial court erred in excluding Westco's evidence of that cancellation as barred by the parol evidence rule.  We agree with the trial court that the contract terms here are unambiguous

24

—the language is clear and explicit and does not involve any absurdity. (Civ. Code, § 1638.) As we have said, the 2013 Master Agreement contained an unambiguous integration clause and precluded the agreement's modification, amendment, termination, or the like, unless the parties agreed in a signed writing. Each assignment contained a similar no-oral-modification provision. Westco does not contend the contracts at issue were not integrated agreements or argue the no-oral-modification provision meant something different. The parol evidence rule undisputedly applied, therefore, and Westco could not introduce extrinsic evidence to contradict the terms of the agreements unless an exception applied. (Code Civ. Proc., § 1856, subd. (a).)

Westco did not seek to admit extrinsic evidence to show the parties had a different intent *at the time the contracts were formed* than the clear language implies, however. Rather, Westco argues the evidence it submitted of events that occurred after the parties signed the 2013 Master Agreement was admissible under Code of Civil Procedure section 1856 to show the parties intended to cancel their agreement in late June 2013, rendering the five assignments void. That evidence consisted primarily of: a copy of the signed 2013 Master Agreement with a handwritten note, "Cancelled per Sam & Atone," written across the front page; MCW's attorney Tiedt's June 21, 2013 email exchange with Bilal telling him that he was drafting a cancellation of the contract "[s]ince money never changed hands and Westco did not perform"; an excerpt from Tiedt's deposition; the declaration of MCW's former COO Dabbas attesting he signed the 2013 Master Agreement and five assignments on behalf of MCW on May 21, 2013, Westco and MCW entered into a cancellation of that agreement on June 24, 2013, and he signed the cancellation agreement on behalf of MCW; and, a copy of a "Cancellation

of Master Assignment Agreement" dated June 24, 2013, and bearing Dabbas's signature on behalf of MCW with a June 25, 2013 signature date.

The trial court found Westco's evidence of the purported cancellation of the 2013 Master Agreement did not raise a question of fact as to the assignments' invalidity because the evidence did not constitute a writing signed by the parties. On an alternative, separate ground, the court excluded Westco's " 'evidence' of any purported cancellation of the assignments," as barred by the parol evidence rule. The only signed, written agreement Westco presented was the cancellation agreement Dabbas signed. Westco presented no evidence, however, that Nino or another Westco representative signed that document on behalf of Westco. Accordingly, under the terms of the 2013 Master Agreement and assignments, the cancellation was not effective.

Nevertheless, a writing requirement such as the one at issue here may be waived by evidence of the parties' inconsistent conduct. (See *Daugherty Co. v. Kimberly-Clark Corp.* (1971) 14 Cal.App.3d 151, 158 ["[a]n agreement to modify a written contract will be implied if the conduct of the parties is inconsistent with the written contract so as to warrant the conclusion that the parties intended to modify it"].) In other words, " 'the parties may, by their conduct, waive' " a no-oral-modification requirement "where evidence shows that was their intent." (*Biren v. Equality Emergency Medical Group, Inc.* (2002) 102 Cal.App.4th 125, 141 [amendment to written approval requirement could be inferred based on past oral votes of approval and oral amendment of writing requirement; plaintiff's behavior also showed an intent to treat the written approval requirement "as if it never existed"]; *Garrison v. Edward Brown & Sons* (1944) 25 Cal.2d 473, 479 [same].)

Westco argues Tiedt's email and deposition testimony, the handwritten cancellation note, the cancellation agreement signed by Dabbas, and Dabbas's declaration raise a triable issue of material fact as to whether (or show as a matter of law) the parties, through their conduct, intended to cancel the 2013 Master Agreement in late June 2013. But, that evidence does not show the parties intended to waive the agreement's writing requirement. Indeed, the evidence that MCW's attorney drafted a written cancellation agreement belies any such conclusion. The preparation of a written cancellation agreement with signature blocks for all parties to sign can be interpreted only as conduct *consistent* with the parties' intent to adhere to the writing requirement. Moreover, *after* the purported cancellation of the 2013 Master Agreement in June 2013, the parties referred to and incorporated the entirety of the 2012 and 2013 Master Agreements in the recitals of their *signed* August 2013 Authorization Agreement—again demonstrating their intent to abide by the various agreements' writing requirements.

Westco argues the writing requirement did not apply. It contends its signature was not required to cancel the 2013 Master Agreement because, under the agreement's terms, MCW had the unilateral right to cancel or terminate the agreement if Phillips failed or refused to approve the assignments by July 3, 2013, or if the closing did not take place by that date. We do not agree. As MCW notes, the purported cancellation agreement was dated June 24, 2013, *before* MCW would have had any right to terminate the agreement unilaterally. Westco appears to contend MCW did not have to wait for the July 3, 2013 deadline to pass because the parties had not performed. But, the contract did not give MCW (or Westco) the right to cancel the agreement for nonperformance before July 3. In any event, as we discussed, the purported cancellation agreement called for Westco's

signature. If MCW had a unilateral right to cancel the agreement at that point, it would not have drawn up an agreement calling for Westco's signature.

Nor can we conclude the excluded extrinsic evidence about canceling the 2013 Master Agreement raises a triable issue of fact as to whether the parties mutually abandoned or rescinded that agreement and the five assignments, as Westco seems to contend. (See *Honda v. Reed* (1958) 156 Cal.App.2d 536, 539 [" 'mutual rescission or abrogation of a written contract may be effected by an oral agreement' "]; *Haberman v. Sawall* (1925) 72 Cal.App. 576, 581 [parol evidence admissible to show parties mutually abandoned written contract].) Had the parties done so, they would have had no reason to incorporate the 2013 Master Agreement—which would have been inoperative—"as though fully set forth" in their August 2013 Authorization Agreement.[17] At a minimum, they at least would have mentioned the agreement's cancellation when referring to having "entered into [it] on June 1, 2013 for the assignment of" the five gas contracts.

No rational trier of fact could conclude the parties impliedly abandoned or rescinded the 2013 Master Agreement and five assignments when they not only incorporated the entirety of that agreement into the 2013 Authorization Agreement, but also made the effective date of the Authorization Agreement the same as the 2013 Master Agreement—June 1, 2013. (Cf. *Grunwald-Marx, Inc. v. Los Angeles Joint Board, Amalgamated Clothing Workers* (1961) 192 Cal.App.2d 268, 279–280 [" ' "It is well settled that an abandonment of a contract may be implied from the acts

---

[17] Nor would there be any reason for Westco to represent and warrant "it was authorized and empowered to enter into the Master Assignment Agreement dated June 1, 2013."

28

of the parties and this may be accomplished by the repudiation of the contract by one of the parties and by the acquiescence of the other party in such repudiation." ' "]; *Schertzinger v. Williams* (1961) 198 Cal.App.2d 242, 246 ["circumstantial evidence of abandonment or rescission of a contract is the rejection of the existence of the contract by some word or act of one of the contracting parties plus some word or act of the other contracting party assenting to the abandonment or rescission of such contract"].)  In incorporating the 2013 Master Agreement, MCW and Westco decidedly were not rejecting it.

Finally, we note Westco only challenges the trial court's exclusion of its cancellation evidence as barred by the parol evidence rule.  But the trial court also sustained Boyett's and MCW's objections to the admission of the June 2013 email exchange and to the handwritten note (by Boyett only)—on the ground the evidence was inadmissible hearsay—and to Tiedt's deposition testimony discussing the matter—on the grounds he lacked personal knowledge and the document was incomplete. As Westco does not challenge *those* evidentiary rulings on appeal, we consider that evidence "to have been properly excluded." (*Lopez*, *supra*, 98 Cal.App.4th at pp. 1014–1015.)

In any event, because no trier of fact could infer from the evidence that the parties intended to waive the agreement's writing requirement to cancel the agreement—or that they mutually abandoned or rescinded the agreement—Westco has failed to demonstrate prejudicial error from the court's exclusion of the extrinsic evidence it contends shows the parties canceled the 2013 Master Agreement in late June 2013, rendering the assignments void.

29

4.    ***The assignments were not automatically invalidated if conditions in the 2013 Master Agreement failed***

Having concluded Westco cannot demonstrate the parties canceled the 2013 Master Agreement on June 25, 2013, we consider Westco's contention that the assignments were not effective because the parties did not intend for them to be delivered unless the conditions in the 2013 Master Agreement were satisfied—Phillips's consent by July 3, 2013, and MCW's payment of $550,000 to Westco upon Phillips's consent.

We first address Westco's contention that the court failed to construe the 2013 Master Agreement and assignments together and thus did not consider that the delivery of the assignments was subject to these conditions. To the contrary, as the court articulated at the hearing on the parties' motions, it considered the 2013 Master Agreement and five assignments, as well as the rest of the parties' agreements, as one transaction, as it should have. (Civ. Code, § 1642; *Versaci, supra*, 127 Cal.App.4th at p. 814.)

Moreover, although the trial court's written ruling did not explicitly address Westco's contention that the conditions in the 2013 Master Agreement failed, the court considered it at the hearing when Westco specifically argued there was a failure of the conditional delivery of the assignments when Phillips did not approve them by July 3, as well as when MCW did not pay Westco $550,000 on that date.

a.    *Phillips's failure to consent to the assignments by July 3, 2013, did not invalidate them*

Westco contends Phillips's approval of the assignments by July 3, 2013 was a condition precedent to their delivery, the failure of which rendered the assignments as if they never had been made. We do not necessarily disagree that if Phillips did not consent to the assignments they would not be effective.

30

We do disagree, however, that the parties intended for the assignments automatically to be rendered void—as Westco seems to argue—if Phillips did not consent to them by July 3, 2013.

We look first to the plain language of the contract. The 2013 Master Agreement provides for MCW initially to pay Westco $200,000—of the total $750,000 consideration—in the form of a credit on Westco's debt. That obligation arose when the contract was formed as of its June 1, 2013 effective date. MCW presented evidence—discussed below—that it "made and extended" the $200,000 credit to Westco on June 1, 2013. The agreement then provides that MCW "will make a second payment of . . . $550,000[ ] to Westco upon . . . Phillip[s's] approval of this Agreement and all Assignments."

The next section—entitled, "Voidable Agreement"—is the one on which Westco relies. The first sentence provides MCW is not obligated to pay Westco unless the parties have signed all the assignments (which they did). The second sentence states that if Phillips fails or refuses to approve the agreement and assignments by July 3, 2013, or rejects them, then the 2013 Master Agreement and assignments are "void," and Westco must return the first $200,000 payment (credit) to MCW. Westco contends it presented evidence from which a trier of fact could infer Phillips did not approve the assignments by July 3, 2013, and the "nonoccurence" of that condition (and MCW's concurrent payment of $550,000) rendered the assignments void as a matter of law.

Although parties are not bound by an agreement where they understand approval of a third party is necessary for the agreement to take effect, that "is true, . . . 'only where it can be said that reasonable persons would have understood that the agreement would *not* be effective when originally signed.' " (*Frankel v. Board of Dental Examiners* (1996) 46 Cal.App.4th

31

534, 549.)  Thus, the " 'mere fact that . . . the actions agreed to be performed under a contract are not due until a later date and there is a present anticipation of a possible future repudiation . . . is not a valid basis for concluding that the contract is not presently binding and effective.' "  (*Id.* at pp. 542, 549–550 [where stipulated settlement of disciplinary action against dentist provided it was " 'of no force or effect' " if the board failed to adopt the settlement, dentist could not withdraw his assent to the settlement on ground stipulation was not effective before the board had a chance to approve it].)

Here, the only reasonable interpretation of the agreement is that it was effective *before* Phillips's approval of the assignments was received.  MCW otherwise would have had no obligation to make the first $200,000 payment to Westco. That Phillips had not approved the assignments as of July 3, 2013, therefore, cannot be construed as nullifying the 2013 Master Agreement and concurrently-signed assignments.  That reading is consistent with the closing provision.  Although the closing of the transaction also was set for July 3, 2013, or another date the parties agreed to in writing, MCW—but not Westco— had the *option to terminate* the agreement—meaning the agreement was effective before that date—if Westco delayed the closing.  The parties thus intended that they be able to perform the agreement after July 3, 2013, if MCW consented to the delay.

Westco, however, would have us isolate the condition of Phillips's "timely" approval from the first sentence of the "Voidable Agreement" provision and from the rest of the contract. We must construe the contract terms together when ascertaining intent.  (Civ. Code, § 1641; *Ogburn v. Travelers' Ins. Co.* (1929) 207 Cal. 50, 52–53 (*Ogburn*) [A contract is construed "as an entirety, the intention being gathered from the whole instrument, taking it by its four corners.  Every part thereof should be given

32

some effect."].)  Reading the sentences in the provision together along with MCW's option—in the very next provision—to terminate the agreement if its closing were delayed beyond that same July 3, 2013 deadline, we conclude the parties intended to make the agreement and assignments voidable at MCW's election if Phillips did not consent to them by July 3, 2013.  (See *Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 929–930 (*Yvanova*) [void contract is "without legal effect," but a voidable transaction " 'is one where one or more parties have the power, by a manifestation of election to do so, to avoid the legal relations created by the contract, or by ratification of the contract to extinguish the power of avoidance' "].)

 As the provision's title states, the agreement and assignments were *voidable* by MCW if the stated conditions— the execution of all five assignments and Phillips's approval of them by July 3, 2013—did not occur.  (See *Ogburn, supra*, 207 Cal. at pp. 52–53 [considering entire insurance policy including introductory clause or caption to interpret intended coverage].)  Moreover, had the agreement and assignments voided upon the mere passing of July 3, 2013, without Phillips's approval, then Westco would have had to return the $200,000 credit payment.  Westco presented no evidence, however, that the credit ever was reversed, much less within five days of July 3, 2013.

 In any event, the condition was written for *MCW's benefit*.  The entire section is entitled "Purchase Price."  The "Voidable Agreement" provision allowed MCW to avoid paying the purchase price if Phillips did not approve of (or rejected) the assignments by the July 3, 2013 closing date.  That makes sense.  Without Phillips's approval of the assignments, the fuel contracts would be worthless to MCW:  MCW would be unable to deliver Phillips's fuel to the affected gas stations unless Phillips agreed the contracts could be assigned from Westco to MCW.  Contract

provisions, including timeliness provisions, "are subject to waiver by the party for whose benefit they are made." (*Galdjie v. Darwish* (2003) 113 Cal.App.4th 1331, 1339–1340 [seller of real property waived timeliness provision "by continuing to deal with" buyer after dates specified in contract passed].)

The parties' conduct after July 3, 2013 supports the implied finding that MCW did not elect to avoid the agreement, or it (and, really Westco, too) waived the July 3, 2013 deadline. As we discussed, had either party deemed the 2013 Master Agreement and assignments void, neither would have executed the August 2013 Authorization Agreement, incorporating the master agreements, after that date had passed.[18] That conduct was "so inconsistent" with either party's intent to enforce any purported right to require Phillips to have consented to the assignments by July 3, 2013, that the "intention to give up that right will be *presumed*." (*Oakland Raiders v. Oakland-Alameda County Coliseum Inc.* (2006) 144 Cal.App.4th 1175, 1194.) Westco presented no evidence to support a contrary conclusion.

Finally, the evidence shows Phillips did in fact approve the assignment of the five fuel contracts from Westco to MCW: by email on July 19 and 23, 2013, Phillips's personnel approved the transfer of two of the gas station sites from Westco to MCW; Phillips signed the ship to transfer forms, between August 12 and 23, transferring the five stations subject to the assigned fuel contracts from its reseller agreement with Westco to its reseller

---

[18] In essence, the 2013 Authorization Agreement was a signed writing by the parties acknowledging their agreement to postpone the closing of the transaction—as both the 2012 and 2013 Master Agreements permitted—based on their further negotiations.

34

agreement with MCW; and Phillips entered into an amendment to its master reseller agreement with MCW—effective August 23, 2013—adding the five stations subject to the assigned fuel contracts.

Westco's evidence does not raise a triable issue as to Phillips's actual consent to the assignments or support finding the assignments were void when the July 3, 2013 "expiration date" passed.

b.     *Westco did not meet its burden to demonstrate*
       *the assignments failed for lack of consideration*

Westco also contends the assignments were void as a matter of law for a failure of consideration. Westco would have us construe MCW's failure to make a payment of $550,000 to Westco upon Phillips's approval of the assignments as a failed condition rendering the 2013 Master Agreement void—rather than voidable—and, thus, the concurrently-executed assignments as if they had never been delivered. (See *Yvanova, supra*, 62 Cal.4th at pp. 929–930 [void contract " 'has no existence whatever,' " while voidable contract "may be declared void but is not void in itself"].)

We cannot. First, "[f]ailure of consideration does not . . . vitiate the contract from the beginning; until rescinded or terminated a contract once in effect remains in effect." (*Taliaferro v. Davis* (1963) 216 Cal.App.2d 398, 411.) This is because a "failure of consideration is based, not upon facts existing at the time the mutual promises bargained for in a bilateral contract are made, but upon some fact or contingency which occurs between the time of the making of the contract and the action which results in the material failure of performance by one party." (*Ibid.*) Accordingly, the assignments were not

void or undelivered, as Westco asserts, simply by MCW's failure to pay Westco $550,000 directly.[19]  Second, nothing in the plain language of the agreements suggests the parties intended MCW's delay in paying or failure to pay the $550,000 to nullify the 2013 Master Agreement and concurrently-executed assignments from the beginning.  And, although a failure of consideration "authorizes a recission" (*ibid.*; Civ. Code, § 1689, subd. (b)(2) [party may rescind a contract if consideration for its obligation fails]), Westco affirmatively asserted it was "not seeking to invalidate anything," and, as we have discussed, it did not demonstrate MCW canceled the agreement.

Nor can Westco demonstrate a total failure of consideration or nonperformance in any event.  First, the uncontradicted evidence shows MCW at least partially performed in accordance with the terms of the 2013 Master Agreement and assignments.

---

[19]    Westco argued that under *Ivancovich v. Sullivan* (1957) 149 Cal.App.2d 160, 164–165 the assignments could be only absolute or void and, because the conditions to their delivery were not met, were void.  As Westco asserts, it agreed to assign the fuel contracts "on the terms and conditions" identified in the 2013 Master Agreement.  We have concluded Westco failed to rebut MCW's evidence that the condition of Phillips's approval was satisfied.  As to the "condition" that MCW pay Westco $550,000, had Westco rescinded or declared the 2013 Master Agreement void when MCW assumed Westco's debt instead of paying Westco directly, then we would agree an issue as to the assignments' validity would exist.  But, as we discuss below, because a trier of fact could conclude only that Westco intended to transfer title of the fuel contracts to MCW—i.e., deliver the assignments—after accepting MCW's proffered consideration, MCW's alternative performance did not render the assignments void.

Mia, the accountant-partner from the firm that audited MCW's accounts, declared that, on June 1, 2013, MCW extended the $200,000 credit to Westco—as required by the 2013 Master Agreement—to reduce the amount Westco owed MCW "in connection with prior fuel purchases." On July 13, 2013, MCW also sent a wire transfer of $100,000 to the account Nino provided it, designated " 'Corporate Account.' " Mia declared the payment was made toward the "sum owed" to Westco for the purchase of the five fuel contracts subject to the 2013 Master Agreement and attached the wire confirmation.

And, under each assignment agreement, MCW agreed to assume Westco's obligation to pay Phillips any balance owed on branding expenses paid for the benefit of the subject gas station. MCW presented evidence—a Phillips ship-to transfer form—that, on August 23, 2013, it did just that when it agreed to "assume the responsibility and obligation for payment(s)" to Phillips for $222,124.20 in unamortized program funds that Westco owed Phillips. Westco's liability for those payments simultaneously was released.

Second, Westco presented no evidence to refute MCW's evidence that Westco received valuable consideration—equivalent to, if not exceeding, the purchase price—in exchange for assigning the fuel contracts to MCW. In addition to the above, Mia declared MCW assumed debts of Westco "[a]s part of the consideration that MCW paid to [Westco] for the assignment to MCW of the five . . . [fuel] contracts." According to Mia's firm's review of supporting documentation sent to it in connection with its audits, on July 1, 2013, MCW assumed a promissory note with an outstanding balance of $126,042.63 that Westco had executed in favor of Phillips; and, in August 2013—when Phillips approved the transfers—MCW assumed eight loans totaling $841,171.24 that Westco owed to Phillips to pay for "branding" gas stations

37

with which Westco had fuel contracts.[20] (The trial court overruled Westco's objections to Mia's supplemental declaration and attached exhibits. Westco does not challenge those rulings.)

At the hearing, Westco argued there was no written agreement or any other evidence showing Westco had agreed to accept MCW's assumption of its debt as consideration for the five assignments, instead of the $550,000 direct payment. True, there is no evidence of a writing signed by the parties providing for MCW to pay the $550,000 by assuming Westco's debt. But the lack of a signed agreement to that effect does not render the assignments *void,* as Westco contends, or raise a triable issue as to whether they were void. Nor does the possibility that Westco did not receive the full benefit of its bargain when MCW assumed Westco's debt instead of giving Westco $550,000, raise a triable issue of fact as to the assignments' validity.

As we discussed, any failure on MCW's part to provide the required consideration at best might render its agreement to assign the fuel contracts voidable by Westco—a remedy Westco has asserted it does not seek.[21] Moreover, the only conclusion

---

[20] Mia's declaration attached a copy of Westco's promissory note to Phillips, sent to his firm around the time of the transaction, and a summary of the debt MCW assumed, prepared under Mia's "guidance and supervision" in connection with his firm's audit of MCW's parent company's consolidated financial statements.

[21] And, there is no evidence that Westco could return the consideration MCW paid for the assignments. As the trial court said when responding to Bilal's argument that MCW did not perform, "you don't have the money to pay [MCW] back when you want to undo this deal. [¶] . . . [¶] They can't do anything and reverse anything. Westco . . . is not in business anymore.

that can be drawn from the evidence presented is that Westco accepted MCW's consideration. Having accepted that performance, Westco cannot now claim the deal should be undone because the consideration it received was in a different form than the parties contemplated originally. (See *North American Dredging Co. v. Outer Harbor D. & W. Co.* (1918) 178 Cal. 406, 415 [plaintiff could not accept defendant's partial performance without "waiving its right to rescind the contract upon the ground of the defendant's failure to fully perform it"; to permit otherwise "would be to allow the party to receive a portion at least of the benefits accruing to him under the contract with one hand while preparing to destroy it with the other"].) Accordingly, even if a finder of fact were able to conclude MCW's performance was defective, Westco is precluded from declaring the 2013 Master Agreement void and assignments invalid.

5. ***The evidence does not raise a triable issue of fact demonstrating the parties did not intend to transfer title of the fuel contracts***

Finally, Westco contends triable issues of fact exist as to whether the parties intended title of the fuel contracts to transfer to MCW, despite having executed the assignments. We already have rejected Westco's contention the assignments never were effectively delivered because MCW canceled the agreement and conditions required for their delivery did not occur.

Westco also appears to contend a trier of fact could infer from the evidence that, when the parties in August 2013 transferred Westco's rights and obligations to MCW to deliver fuel to the five gas stations, they did not intend for title to

---

They're basically a defunct company. So there's nothing they can do to perform under any of these contracts."

39

the fuel contracts to transfer to MCW. Westco primarily relies on (or relied on in the trial court): MCW's allegation in its FAC that when Phillips cut off Westco's fuel supply in August 2013, "Nino asked MCW to take over fuel deliveries on a <u>temporary basis</u>"; the August 21 and 22, 2013 email exchange about MCW not purchasing the fuel contracts, but temporarily servicing the five gas stations so they could receive fuel deliveries; Tiedt's deposition testimony about that exchange; Thomas's deposition testimony in case number BC522207 that the five sites were temporarily transferred to MCW; Westco's attorney Scapa's December 2013 letter to Phillips that Westco was trying to sell the five gas stations and master reseller agreement; and Bilal's declaration that he continued to negotiate with Tiedt and MCW in 2014 to purchase the fuel contracts.

As an initial matter, we presume the trial court properly excluded—based on the evidentiary objections it sustained—the August 21 and August 22, 2013 email exchange, Tiedt's deposition testimony, and Thomas's deposition testimony. Although Westco argued—and appears to argue on appeal—the e-mail exchange and testimony could not be excluded under the parol evidence rule, Westco does not challenge the court's evidentiary rulings sustaining MCW's objections on appeal.[22]

Accepting as true MCW's allegation that Nino asked it to temporarily service the five stations—and even if we were to consider the August 2013 email exchange and the Tiedt and Thomas deposition testimony—we cannot conclude a reasonable trier of fact could infer the parties did not intend for the executed

---

[22] MCW objected to the exhibits containing the Tiedt and Thomas depositions as "[i]ncomplete document[s]." We discussed MCW's objections to the e-mail exchange above.

40

assignments to take effect when Westco transferred the fuel contracts to MCW in August 2013.

First, any agreement by the parties to have MCW temporarily supply fuel to the affected gas stations would not render the assignments *void*. Westco agreed to sell the five fuel contracts to MCW. There is no evidence that Westco and MCW entered a written agreement to terminate or cancel the sale of those fuel contracts—and, therefore, nullify the executed assignments—before or after they purportedly agreed MCW would temporarily service the stations at a moment when Westco's fuel supply had been shut off. (Moreover, a decision by the parties to delay further the closing for the contracts' purchase would be part of the further negotiations they agreed to in the 2013 Authorization Agreement. The 2013 Master Agreement essentially was a continuation of the 2012 transaction after the closing for the purchase of the last five contracts was postponed. As the trial court aptly put it, the parties then agreed in August 2013 to negotiate further the implementation of that sale after Bilal's conduct with respect to his assertion of his shareholder rights "caused additional negotiations to take place.")

Second, the only conclusion to be drawn from the uncontroverted evidence is that the parties went ahead and performed their agreement to transfer title of the assigned fuel contracts: Westco and MCW asked Phillips to consent to the assignment of Westco's rights (and obligations) under its reseller agreement to deliver fuel to the five stations, which it did;[23]

---

[23] Thomas declared Westco and MCW asked Phillips for its consent in August 2013, and Phillips "consented to the transfers and assignment of these rights." Citing Thomas's deposition, Westco argues Phillips approved the transfers "only for purposes of temporary servicing (not a transfer of ownership)." In his

41

Westco (through Nino) agreed to the transfer of the five stations from its reseller agreement to MCW's reseller agreement; and the five affected stations were added to MCW's reseller agreement.

The uncontroverted evidence also shows that when the five stations were transferred to MCW's reseller agreement, MCW had the executed assignment agreements in hand, had applied the $200,000 credit to amounts Westco owed it, had wired $100,000 to Westco through Nino, and had agreed to assume Westco's obligations under its reseller agreement for the five stations, releasing Westco from further liability. And, around the time of the transfer, MCW had assumed over $840,000 of debt Westco owed Phillips.

No reasonable fact finder could conclude MCW would assume that much debt or Westco's obligations owed to Phillips unless title to the fuel contracts for the five sites had transferred —as the parties agreed—when the sites were added to MCW's reseller agreement. Westco disputes that it received the consideration due under the 2013 Master Agreement, but, as we said, it presented no evidence to refute the Mia declaration and exhibits evidencing Westco received consideration for the

_____

deposition, Thomas testified he "facilitated the temporary transfer" of the five fuel distribution contracts to MCW to keep the stations in business. He had no expectation as to whether the five contracts would be "transferred back" to Westco "at some time in the future," stating, "They could and they could not." Thomas assumed if Westco repaid its debt to Phillips and gave it sufficient security, then the contracts "could get transferred back." That debt exceeded $1 million. As we said, the trial court sustained MCW's evidentiary objection to Thomas's deposition testimony. In any event, it does not raise a triable issue of fact as to whether the parties intended the assignments to be effective.

42

purchase of the five fuel contracts. Nor did Westco introduce any evidence that it rejected MCW's assumption of its debt as satisfying the balance due on the purchase price, or that it reversed or tendered back the $200,000 credit or $100,000 wire transfer that MCW had made in June and July 2013.

Moreover, the documents effectuating the transfer of the five stations from Westco's to MCW's reseller agreement do not state the transfer is temporary or otherwise imply the fuel contracts would be transferred back to Westco at a certain point. Nor did (or could) Westco present evidence from which a trier of fact could infer that was possible. Phillips had placed Westco on a credit hold and shut off its fuel supply. Westco could not deliver fuel from Phillips to any station unless it repaid the $1 million it owed. That never happened. Nor is there any evidence in the record that Westco could have repaid that debt. Indeed, on December 17, 2013, Westco, through its former attorney Scapa, "acknowledge[d]" it owed money to Phillips, but admitted there were "insufficient funds . . . to liquidate any debt."

Westco argues triable issues of material fact exist as to the parties' intent to transfer title of the fuel contracts based on evidence that, after August 2013, Westco continued to attempt to sell the fuel contracts, and MCW continued negotiations with Westco to purchase them. Westco relies on the above letter from Scapa that describes Westco's plan to sell the subject five gas stations and Westco's master reseller agreement. We cannot conclude that evidence presents a triable issue of material fact.

Westco's attorney declared he sent that letter on the same day his clients retained him. His statement in the letter that Westco's 2009 master reseller agreement with Phillips "[c]urrently . . . covers" the five gas stations is plainly incorrect. Those sites undisputedly were removed from that agreement and transferred to MCW's master reseller agreement, as we

43

have discussed. Westco's purported desire in December 2013 to sell its master reseller agreement along with the physical sites does not raise a reasonable inference that the fuel contract assignments were ineffective when Westco's master reseller agreement no longer included the five gas stations. Nor did Westco present any evidence that the parties canceled or reversed the August 2013 transfer of the sites to MCW's reseller agreement. Moreover, Westco's sale of the *physical* gas station sites does not demonstrate it retained title to the fuel contracts to deliver fuel to those sites.

And, as the trial court found, in March 2014, Westco admitted "five . . . contracts were transferred" from Westco to MCW in August 2013. Because MCW had been "unwilling to pay the agreed upon purchase price," under the "Master Purchase Agreement," Westco was "exploring its remedies, including a demand that [MCW] transfer back" the fuel contracts to Westco. In other words, Westco admitted the assignments were delivered and was seeking to rescind them.[24] (Westco argues the letter refers to the temporary transfer for MCW to supply fuel to the gas stations, but if that were so, it would not have referred to the purchase price or the parties' agreement.)

Nor do Bilal's purported negotiations with MCW in 2014 raise an inference that the assignments of the fuel contracts to MCW were ineffective. Bilal declared that, from May 2014 until November 2014, "MCW and John Tiedt were negotiating with me to purchase [Westco's] five [fuel] contracts. In fact, we had put a deal together; however, MCW pulled out in about November

---

[24] Bilal declared he was "shut out of [Westco] by Nino" from August 2012 until Nino's death on January 30, 2014. His letter was "an inquiry and an effort to determine the status of [Westco's] assets and nothing more."

2014." Bilal's declaration is not a writing signed by the parties to cancel the assignments or undo the August 23, 2013 transfer of the sites to MCW's reseller agreement. Nor does he say Westco and MCW agreed to reverse that transfer. His statements do not raise a triable issue of material fact, therefore, as to whether the assignments were void. Moreover, MCW commenced this action—naming Westco and Bilal as defendants—on April 18, 2014. Accordingly, any negotiations between Tiedt and Bilal about the transaction during the stated time frame would have been conducted in the context of the pending litigation.

At the end of the day, Westco assigned the five fuel contracts to MCW, the contracts were in fact transferred to MCW, and Westco received valuable consideration from MCW in exchange for the contracts. That evidence is uncontroverted. And, any questions of fact surrounding the transaction are immaterial to the issue of whether the assignments were void— the only issue before the trial court. Westco may feel it got short-changed on the deal, but to the extent it does, its fight is with Nino who, for purposes of this appeal, was authorized to transfer the contracts to MCW in exchange for the consideration MCW undisputedly gave.

Accordingly, the trial court did not err in granting MCW's motion for summary adjudication and ordering the five assignments were valid.

## DISPOSITION

The December 10, 2019 order dismissing cross-defendant Aleksandr Blyumkin from Westco Petroleum Distributors, Inc.'s second amended cross-complaint based on the court having granted MCW Fuels, LLC's motion for summary adjudication on October 4, 2019, entered on October 24, 2019, is affirmed. Treating as a petition for writ of mandate Westco Petroleum Distributors, Inc.'s appeal from that same order dismissing

45

cross-defendants MCW Fuels, LLC, Stan Boyett & Son, Inc., and Phillips 66 Company from its second amended cross-complaint, the petition is denied.

Respondents MCW Fuels, LLC, Aleksandr Blyumkin, and Stan Boyett & Son, Inc. are to recover their costs on appeal. Phillips 66 Company did not participate in this appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**



EGERTON, J.

We concur:



EDMON, P. J.



LIPNER, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.